UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

ANGEL PATTON,                        )
                                     )
              Plaintiff,             )
                                     )
v.                                   )        No.: 1:16-CV-327-TAV-CHS
                                     )
VOLKSWAGEN GROUP OF AMERICA          )
CHATTANOOGA OPERATIONS, LLC,         )
                                     )
              Defendant.             )


**<u>MEMORANDUM OPINION</u>**

This civil matter is before the Court on Defendant's Motion To Compel

Arbitration and Dismiss Complaint [Doc. 5].  Plaintiff responded in opposition to this

motion [Doc. 10], defendant replied [Doc. 11], plaintiff filed a sur-reply [Doc. 16], and

defendant submitted a sur-sur-reply [Doc. 17].

For the reasons set forth herein, the Court will grant defendant's motion, compel

arbitration of plaintiff's claims, and dismiss the complaint.

I.     **Background**[1]

Plaintiff, Angel Patton, was hired by defendant, Volkswagen Groups of America

Chattanooga Operations, LLC, as a laboratory engineering specialist in 2011 [Doc. 1

¶¶ 1, 6; Doc. 5-2 p. 7].  Prior to working for defendant, plaintiff attended community

college for two years and held the positions of "project specialist," "lead production

_____

[1] The Court will only include facts relevant to its determination of defendant's motion to
dismiss.

supervisor," and "operations manager" at various times [Doc. 11-2 p. 2]. Plaintiff signed an offer of employment with defendant on October 19, 2011, and she promptly returned a signed copy of the offer letter to defendant [Doc. 11-3]. This offer letter noted that plaintiff's employment offer was conditioned on acceptance of an arbitration agreement [*Id.* at 2]. Defendant sent plaintiff a new-hire packet via overnight delivery upon receipt of her signed offer letter, which included a welcome letter and the arbitration agreement alluded to in the offer letter [Doc. 11-1 ¶ 6].

On her first day of employment, October 24, 2011,[2] plaintiff signed the agreement to arbitrate [Doc. 5-1 pp. 4–6].[3] This agreement states, "Any and all disputes which involve or relate in any way to [plaintiff's] employment (or termination of employment) with [defendant] . . . shall be submitted to and resolved by final and binding arbitration" [*Id.* at 4]. Specifically, the agreement states that covered claims include those related to employment discrimination or harassment on the basis of age or sex [*Id.*]. It also includes an explicit waiver of the signee's right to a jury trial [*Id.*]. The agreement further asserts that "[t]he arbitrator shall have exclusive authority to resolve any Claims,

---

[2] Plaintiff states that she was hired on October 24, 2012 [Doc. 1 ¶ 6]. Dated documents provided by defendant, however, establish that plaintiff was hired on October 24, 2011 [*See, e.g.*, Doc. 5-2 p. 7].

[3] Plaintiff claims that she received the arbitration agreement immediately before she was required to sign it, rather than having received the document in the mail days before, as asserted by defendant [Doc. 16-1 ¶ 4]. Defendant submits substantial evidence, however, that plaintiff received the arbitration agreement at least three days prior to her first day of work [Doc. 11-1 ¶¶ 6–7; Doc. 17-1 ¶ 4; Doc. 17-2 ¶¶ 2–4]. The Court will examine this evidence submitted by defendant in greater detail herein.

2

including, but not limited to, a dispute relating to the interpretation, applicability, enforceability or formation of this Agreement" [*Id.* at 5].

The arbitration agreement is clearly titled "Agreement to arbitrate," in bold font [*Id.* at 6].  It states directly above the signature line, "I have read and understand the foregoing and agree that if I am unable to resolve my differences with [defendant] through mutual agreement, I will submit all disputes, claims or controversies arising out of or relating to this Agreement to neutral arbitration in accordance with this Agreement" [*Id.*].

According to plaintiff, on her first day of employment, defendant instructed her to sign "a very thick stack of forms said to be [defendant's] hiring paperwork," which contained the arbitration agreement [Doc. 10-1; Doc. 10-3 ¶ 5].  Plaintiff claims that defendant's characterization of the arbitration agreement as "hiring paperwork" was a "false statement" [Doc. 10-1 p. 4].  She further states that she and the other new employees were not given much time to review the forms, were not specifically directed to the arbitration agreement, and did not receive further information as to what they were signing [*Id.* at 3; Doc. 10-3 ¶¶ 6–7, 10, 11].  Plaintiff says that this process was "pressured and rushed" and that defendant pushed the new employees to sign the forms quickly [Doc. 10-1 p. 3; Doc. 10-3 ¶ 8].  Thus, according to plaintiff, she did not realize that she signed an arbitration agreement, and, moreover, she "did not know what the word arbitration mean[t]" at that time [Doc. 10-1 p. 3; Doc. 10-3 ¶¶ 12–13].

3

Defendant presents evidence, however, that—at the time of plaintiff's hire—its benefits specialist routinely met with new hires on their first day of work and showed them a PowerPoint presentation, which included three slides covering the arbitration agreement [Doc. 17-1 pp. 3, 12–14]. The acting benefits specialist in October 2011, contends that it was defendant's practice at that time to "encourage the attendees to ask any questions that they may have" and that defendant did not discourage new hires from asking questions [*Id.* at 3]. He also states that it was defendant's practice to encourage new hires to read the packet of materials, including the agreement to arbitrate [*Id.*]. It has never been, according to defendant's benefits specialist, defendant's routine practice to tell new hires that the arbitration agreement was not a contract, as contended by plaintiff [*Id.*].

Defendant also submits an affidavit of Marcio Baleki, who accepted an offer of employment during the same month as plaintiff [Doc. 17-2 ¶ 2]. Baleki states, under oath, that he received a new-hire packet in the mail after accepting employment with defendant and that he brought the packet with him to his first day of employment [*Id.* ¶ 3]. Baleki further asserts that he remembers plaintiff being in the same new-hire orientation class that he attended on October 24, 2011 [*Id.* ¶ 4]. Baleki states that, during this orientation class, defendant's benefits specialist explained the documents using a PowerPoint presentation [*Id.* ¶ 5]. He affirms that the new hires, plaintiff included, had the opportunity to ask questions about the documents during and after the presentation

4

and that none of defendant's employees encouraged the new hires to sign the forms without reading them [*Id.* ¶ 7].

As to the facts giving rise to plaintiff's claims currently before the Court, plaintiff contends that, while she was employed by defendant, defendant treated her differently than other employees due to her age and sex [Doc. 1 ¶ 7]. She also claims that she was assaulted by a male co-worker on or about September 2, 2015 [*Id.* ¶¶ 8–10]. Plaintiff asserts that she reported this assault to her supervisor the same day and that he ignored this report [*Id.* ¶¶ 11–13]. Plaintiff claims that defendant then planned a "surprise audit," which it knew plaintiff was unprepared for, in order "to have a pretext to fire her" [*Id.* ¶¶ 14–17, 21]. Rather, according to plaintiff, defendant decided to fire plaintiff because she reported the assault, because of her age, and because of her "nonconforming gender behavior" [*Id.* ¶ 18]. Defendant suspended plaintiff's employment without pay on September 4, 2015, and discharged her employment on October 1, 2015 [*Id.* ¶¶ 19–20; Doc. 5-1 ¶ 7].

Upon termination, plaintiff filed an administrative charge with the United States Equal Employment Opportunity Commission ("EEOC") and received a right-to-sue letter from the EEOC [Doc. 1 ¶¶ 5, 23–25; Doc. 1-3]. She now brings suit under the Age Discrimination in Employment Act ("ADEA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and Tenn. Code Ann. § 4-21-401 [Doc. 1 p. 1]. Plaintiff specifically claims that defendant chastised and fired her for behavior that defendant deemed acceptable for male employees and younger employees, that defendant fired her in retaliation for her

report of workplace harassment, and that defendant systematically ignored her claims of workplace harassment [*Id.* ¶¶ 26–43].

After plaintiff filed the current lawsuit, defendant's counsel contacted plaintiff's counsel and brought to her attention the arbitration agreement signed by plaintiff [Doc. 5-2]. Thus, defendant's counsel requested that plaintiff agree to voluntarily dismiss her lawsuit and submit her claims to arbitration [*Id.*]. Plaintiff refused, and defendant now, therefore, moves the Court to dismiss plaintiff's claims and compel arbitration, pursuant to Rule 12(b) [Doc. 5].

## II.    Standard of Review[4]

Federal courts are courts of limited jurisdiction, possessing "only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). Therefore, subject matter jurisdiction is a threshold issue, which the Court must consider prior to reaching the merits of a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998); *see* Fed. R. Civ. P. 12(h)(3) (stating that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action"). Unlike a motion to dismiss on the merits

---

[4] The Court notes that defendant moves for dismissal of plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b), without specifying what subsection of Rule 12(b) should apply [Doc. 6 p. 1]. Defendant asserts that courts within this district have chosen to address motions to dismiss and compel arbitration under both Rule 12(b)(1) and Rule 12(b)(6) [*See id.* at 12 n.4 (citing *Andrews v. TD Ameritrade, Inc.*, 596 F. App'x 366 (6th Cir. 2014); *Harris v. TD Ameritrade, Inc.*, No. 4:14–CV–0046, 2015 WL 64880 (E.D. Tenn. Jan. 5, 2015); *Marshall v. ITT Tech. Inst.*, No. 3:11–CV–552, 2012 WL 1565453 (E.D. Tenn. May 1, 2012))]. Plaintiff did not address in its opposition which standard should apply [*See generally* Doc. 10]. The Court finds, based on the record, that Rule 12(b)(1) supplies the appropriate standard of review in this matter.

under Rule 12(b)(6), "where subject matter jurisdiction is challenged under Rule 12(b)(1) . . . the plaintiff has the burden of proving jurisdiction in order to survive the motion." *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (quoting *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986)) (internal quotation marks omitted).

"Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). "A *facial* attack is a challenge to the sufficiency of the pleading itself." *Id.* In considering whether jurisdiction has been established on the face of the pleading, "the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party." *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235–37 (1974)).

"A *factual* attack, on the other hand, is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction." *Id.* In considering whether jurisdiction has been proved as a matter of fact, "a trial court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) (citations omitted). "[N]o presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Ritchie*, 15 F.3d at 598 (internal citation omitted).

Here, defendant supports its motion to dismiss by submitting affidavits and exhibits outside the scope of the complaint [Docs. 5-1, 5-2]. Thus, the Court finds that defendant's jurisdictional challenge is a factual attack. *See Ritchie*, 15 F.3d at 598. The Court will, therefore, evaluate all submitted documentation and will weigh the evidence, giving no presumptive truthfulness to plaintiff's allegations.

## III. Analysis

In its motion to dismiss, defendant argues that plaintiff is contractually prohibited from pursuing her claims in this Court because her claims are subject to a binding arbitration agreement, which plaintiff executed while employed with defendant [Doc. 6 pp. 1–2]. It contends that the arbitration agreement constitutes a valid agreement to arbitrate and that all of plaintiff's claims against defendant fall within the scope of the agreement [*Id.* at 7]. Furthermore, in its response to plaintiff's supplemental brief, defendant contends that this Court must compel the "gateway" arbitrability issues to arbitration due to the arbitration agreement's "delegation provision" [Doc. 17 p. 5].

Plaintiff opposes defendant's motion to dismiss, arguing that this Court has jurisdiction to resolve contract formation issues and, pursuant to Tennessee law, should determine that the arbitration agreement between the parties is not valid because defendant fraudulently misrepresented the paperwork and because defendant did not give plaintiff adequate time to review the documents [Doc. 10-1].

The parties appear to disagree as to whether federal or Tennessee arbitration law controls the instant motion. Therefore, the Court will first consider the question of

whether this case is governed by the Federal Arbitration Act ("FAA") or the Tennessee Uniform Arbitration Act ("TUAA").

### A.     Should Federal or State Law Apply

The arbitration agreement at hand includes the following choice-of-law provision: "the arbitration shall be conducted in accordance with [the signee's] home state's laws" [Doc. 5-1 p. 5].  Plaintiff, at all times relevant to this suit, has been a resident of the state of Tennessee [Doc. 1 ¶ 1].  Consequently, plaintiff argues that this Court must interpret the agreement under Tennessee law [Doc. 10-1 pp. 1–2].  In response to this argument by plaintiff, defendant contends that the FAA governs the agreement because the choice-of-law provision does not clearly and unequivocally indicate that Tennessee arbitration law should apply [Doc. 11 pp. 3–4].

The FAA reflects a "liberal federal policy favoring arbitration agreements," *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 377 (6th Cir. 2005), and it dictates that courts must "rigorously enforce arbitration agreements according to their terms."  *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013).  As arbitration agreements are—at their core—contracts, parties may choose the law by which an arbitration agreement is to be conducted.  *See Volt Info. Sci., Inc. v. Bd. Tr. Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989) ("[I]t does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself.").

9

To not allow parties to choose what law applies "would be quite inimical to the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms." *Id.* For "[a]rbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, . . . so too may they specify by contract the rules under which that arbitration will be conducted." *Id.* Thus, if an arbitration agreement clearly and unequivocally indicates that state law shall displace federal law in arbitration, then an interpreting court must apply the law chosen by the parties. *See Jacada (Europe), Ltd. v. Int'l Mktg. Strategies, Inc.*, 401 F.3d 701, 710–12 (6th Cir. 2005) (asserting that federal arbitration law may be displaced by state law if a choice-of-law provision "unequivocally" expresses that intent).

Here, defendant supports its argument that the FAA, and not Tennessee law, governs the parties' arbitration agreement by attempting to differentiate a Supreme Court of Tennessee case cited by plaintiff, *Owens v. National Health Corp.*, 263 S.W.3d 876, 883 (Tenn. 2007), and by comparing the provision at hand to the choice-of-law provisions addressed in *Jacada* and *SL Tennessee, LLC v. Ochiai Georgia, LLC*, No. 3:11–CV–340, 2012 WL 381338, at *5 (E.D. Tenn. Feb. 6, 2012).

In *Owens*, the court found that the following choice-of-law provision, included in the parties' agreement to arbitrate, clearly provided that the arbitration agreement itself was to be interpreted in accordance with Tennessee law: "this agreement for binding arbitration shall be governed by and interpreted in accordance with the laws of the state

10

where the Center is licensed." 263 S.W.3d at 883. Defendant argues that the choice-of-law provision here, "the arbitration shall be conducted in accordance with [the signee's] home state's laws" [Doc. 5-1 p. 5], "is much more limited in its deference to state law" [Doc. 11 p. 3]. Defendant does not explain, however, in what manner these two provisions differ. Indeed, the Court finds that these provisions communicate a substantially similar intent.

In contrast, the Court finds the choice-of-law provisions at issue in *Jacada* and *SL Tennessee* factually differentiable from the provision in the agreement here. In *Jacada*, the court examined a distribution contract that contained a general choice-of-law provision, as well as a separate arbitration clause. 401 F.3d at 703. Thus, the court found that this general clause did "not unequivocally suggest an intent to displace the default federal standard" with regard to arbitration. *Id.* at 711. Similarly, in *SL Tennessee*, this Court evaluated whether a choice-of-law provision, stating that the entire contract "shall be governed by and interpreted under the laws of the State of Tennessee without regard to the conflict-of-laws provisions thereof," displaced federal arbitration law. 2012 WL 381338, at *1. Like in *Jacada*, the contract at issue in *SL Tennessee* also included an arbitration clause, separate from the choice-of-law clause. *Id.* Consequently, this Court found that there was "no clear or unequivocal indication that Tennessee law should displace the federal standard on arbitration." *Id.* at *6.

Here, however, as in *Owens*, the Court finds that the parties have clearly and unequivocally agreed that state law shall apply to the arbitration agreement. *See Owens*,

11

263 S.W.3d at 883 ("Therefore, that language does not merely provide that issues of substantive law are to be determined by reference to Tennessee law; it clearly provides that the arbitration agreement itself 'shall be governed by and interpreted' in accordance with the laws of Tennessee.").  This choice-of-law provision is not "general," as argued by defendant, in that it stands separate from the arbitration clause, which are both part of a larger contract.  Instead, the arbitration agreement itself clearly specifies that arbitration shall be conducted in accordance with the signee's home state's laws [Doc. 5-1 p. 5].  In order to "rigorously enforce" the arbitration agreement at hand according to its terms, the Court must "give effect to the contractual rights and expectations of the parties," including their decision to have Tennessee law apply under the current circumstances. *Volt*, 489 U.S. at 479; *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985).

Having determined that Tennessee law governs the arbitration agreement at hand, the Court will now examine whether this Court, or an arbitrator, has authority to decide the threshold issue of arbitrability.

### B.      Who Should Decide the "Gateway" Arbitrability Issue

Plaintiff contends that, pursuant to Tennessee law, this Court must determine whether a valid arbitration exists between the parties, applying ordinary state-law principles [Doc. 10-1 p. 2].  Defendant argues in opposition, however, that the arbitrator possesses exclusive jurisdiction to determine the arbitrability of plaintiff's claims, due to the arbitration agreement's "designation clause" [Doc. 17 p. 5].

12

A party has the right to judicial determination of the issue of arbitrability, unless the parties "clearly and unmistakably provide otherwise." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *see First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (determining that the question of "who has the primary power to decide arbitrability" hinges on what the parties agreed about that particular matter—"Did the parties agree to submit the arbitrability question itself to arbitration?"); *Javitch v. First Union Secs., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003) (stating that, unless the parties clearly and unmistakably intended otherwise, "[b]efore compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement").

Parties to an arbitration agreement may communicate a clear intent to submit the issue of arbitrability to arbitration through a "delegation provision," which provides that the parties shall arbitrate threshold issues concerning the arbitration agreement. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) (asserting that "parties can agree to arbitrate gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy" (internal citations and quotation marks omitted)); *Danley v. Encore Capital Grp.*, No. 16-1670, 2017 WL 710470, at *1 (6th Cir. Feb. 22, 2017) (upholding the lower court's order that

13

compelled arbitration based on a delegation clause, which expressly authorized an arbitrator to consider the plaintiffs' gateway challenges to the arbitration clause).

Here, the Court finds that the parties "clearly and unmistakably" intended for an arbitrator to determine the gateway issue of arbitrability. The arbitration agreement, which plaintiff does not dispute she signed, includes the following delegation clause: "The arbitrator shall have exclusive authority to resolve any Claims, including, but not limited to, a dispute relating to the interpretation, applicability, enforceability or formation of this Agreement" [Doc. 5-1 p. 5]. Based on the unambiguous, clear language of this provision, the parties intended the arbitrator, not a court, to determine the gateway issue of arbitrability. *See Danley*, 2017 WL 710470, at *3 (compelling arbitrability issues to arbitration based on the following delegation provision: "[a]ll claims relating to your account, a prior related account, or our relationship are subject to arbitration, including Claims regarding the application, enforceability, or interpretation of this Agreement and this arbitration provision").

Although, as discussed herein, Tennessee arbitration law applies to the current agreement, and Tennessee law contemplates judicial resolution of contract formation disputes,[5] the Court must read the agreement's choice-of-law and delegation provisions in harmony. *See Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999) ("All provisions in the contract should be construed in harmony with each other, if possible, to promote

---

[5] The Tennessee Uniform Arbitration Act requires the court to "proceed summarily" to a determination of whether arbitration is required when an "opposing party denies the existence of the agreement to arbitrate." Tenn. Code Ann. § 29–5–303(a), (b).

14

consistency and to avoid repugnancy between the various provisions of a single contract."); *Aetna Cas. & Surety Co. v. Woods*, 565 S.W.2d 861, 864 (Tenn. 1978) ("The proper construction of a contractual document is not dependent on any name given to the instrument by the parties, or on any single provision of it, but upon the entire body of the contract and the legal effect of it as a whole."). Thus, reading the agreement as a whole in determining the meaning of these two parts, the Court finds that the arbitration agreement's delegation provision clearly communicates the parties' intent to displace state law as to this particular issue and to submit the gateway issue of arbitrability to arbitration. *See Aetna*, 565 S.W.2d at 864 ("The whole contract must be considered in determining the meaning of any or all of its parts.").

The Court also finds that plaintiff's challenges to the arbitration agreement fit within the language of this delegation provision. Specifically, plaintiff claims that she did not knowingly and voluntarily waive her right to bring suit outside of the arbitration forum because she received the agreement immediately before signing it, did not have time to read the agreement, was pressured by defendant to quickly sign the agreement, and was not specifically told that the arbitration agreement was contained within the "thick stack" of hiring paperwork [Doc. 10-1 p. 3; Doc. 16 p. 1]. These arguments fall within the scope of the delegation clause, as they go to the arbitration agreement's formation and enforceability [*See* Doc. 5-1 p. 5].

Furthermore, as in *Danley* and *Rent-A-Center*, plaintiff has not challenged, or even mentioned, the delegation provision in response to defendant's motion to dismiss. *See*

15

*Rent-A-Center*, 561 U.S. at 72 (determining that a party seeking to avoid the effects of a delegation clause must challenge it specifically and, if it fails to challenge the provision, then the court should enforce the delegation provision as written); *Danley*, 2017 WL 710470, at *4. Plaintiff argues that this Court has jurisdiction to resolve contract formation issues, but it does not acknowledge the delegation provision contained in the arbitration agreement between the parties [Doc. 10-1 pp. 1–2]. Although the law presumes a court's jurisdiction to evaluate an arbitration agreement's enforceability, as addressed herein, parties may choose to submit the issue of arbitrability to arbitration by "clearly and unmistakably" so providing. *See AT & T Techs.*, 475 U.S. at 649. Based on the parties' clear intent to submit gateway arbitrability issues to arbitration, the Court finds that plaintiff has failed to prove that this Court possesses jurisdiction to rule on plaintiff's challenges to the enforceability and formation of the arbitration agreement.

Although the Court finds that the parties' arbitration agreement contains a valid delegation clause, and it could dismiss plaintiff's complaint under Rule 12(b)(1) on this ground alone, the Court will evaluate the arbitrability of plaintiff's claims out of an abundance of caution due to defendant's last-minute introduction of its delegation-provision argument [Doc. 17].[6] Thus, the Court will now determine whether defendant may compel plaintiff to arbitrate her claims currently before this Court based on the arbitration agreement signed by plaintiff on her first day of employment.

---

[6] Defendant did not point to the delegation provision as grounds for dismissal of plaintiff's claims until its sur-sur-reply [Doc. 17], which stands as the last-filed document on the docket currently before the Court.

16

### C. Arbitrability of Plaintiff's Claims Under Tennessee Law

In order to direct plaintiff to arbitrate her claims against defendant, the Court must determine that: (1) the arbitration agreement was validly obtained pursuant to Tennessee contract law; and (2) plaintiff's discrimination and retaliation claims are covered by the arbitration agreement. *See Javitch*, 315 F.3d at 624. The Court will address both of these prongs in turn.

### 1. Formation of the Arbitration Agreement

While plaintiff is correct that a court may only compel issues to arbitration that the parties agreed to arbitrate, that a legal agreement must be founded in mutual assent, and that acts of fraud invalidate agreements, the Court finds that these statements of law do not invalidate the arbitration agreement at hand [Doc. 10-1 p. 4 (citing *Richmond Health Facilitates v. Nichols*, 811 F.3d 192 (6th Cir. 2016); *Walker*, 400 F.3d at 383; *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498 (6th Cir. 2004))].

Here, plaintiff admits that the arbitration agreement is clearly drafted and that she signed it [Doc. 10-1 pp. 3–4]. Plaintiff argues that the arbitration agreement is not valid, however, because she was not given sufficient time to review the agreement and because "defendant told plaintiff that she was filling out hiring paperwork and health insurance forms rather than signing an arbitration agreement" [*Id.* at 2]. Thus, plaintiff appears to contend that: (1) she did not knowingly and voluntarily agree to arbitrate; and (2) defendant's fraudulent misrepresentation invalidates the agreement to arbitrate.

17

Pursuant to Tennessee contract law, "[i]n evaluating whether [an arbitration agreement] has been knowingly and voluntarily executed, [courts should] look to: (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the [agreement], including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the [agreement]; (4) consideration for the [agreement]; as well as (5) the totality of the circumstances." *Morrison v. Circuit City Stores*, 317 F.3d 646, 668 (6th Cir. 2003) (en banc).

As to plaintiff's experience, background, and education, plaintiff completed two years of college and held several professional positions prior to her employment with defendant, including "project specialist," "lead production supervisor," and "operations manager" [Doc. 11-2]. Thus, the Court finds that the first *Morrison* factor weighs in favor of plaintiff having voluntarily and willingly entered into the agreement to arbitrate.

With regard to the second factor, the amount of time plaintiff had to consider whether to sign the arbitration agreement, the parties disagree as to how long plaintiff possessed the agreement before defendant requested that she sign it. As previously noted, plaintiff states that she was given a thick stack of forms and was pressured to read the forms quickly [*Id.* at 3]. She claims that the arbitration agreement was not specifically mentioned and that she was unaware she signed such an agreement [*Id.*]. She contends that she received these forms during her first day of employment, rather than previously having received them in the mail [Docs. 16, 16-1].

18

Defendant asserts, however, that plaintiff had sufficient time to review the hiring paperwork—including the arbitration agreement—and to ask questions regarding the paperwork's content [Doc. 17 p. 2; Docs. 17-1, 17-2].  At the time of plaintiff's hiring, defendant had a regular practice of mailing new hires packets upon receipt of a signed offer letter, which plaintiff signed and mailed to defendant days prior to her first day of work [Docs. 11-3, 17-3].  This packet included the arbitration agreement at issue [Doc. 17-3].  Furthermore, the offer letter signed by plaintiff explicitly stated that her acceptance of employment was contingent to her acceptance of the arbitration agreement [Doc. 11-3 p. 2].  Finally, defendant has submitted evidence demonstrating that its benefits specialist made a presentation to plaintiff's new hire class on her first day of employment, which covered the arbitration agreement, and permitted time for questions by the new hires with regard to the hiring paperwork [Docs. 17-1, 17-2].

After weighing the evidence submitted by both parties, the Court finds that defendant mailed a new-hire packet to plaintiff approximately three days prior to her first day of employment, which contained the arbitration agreement, that defendant did not discourage questions about the agreement or claim that it was not a contract, and that defendant's benefits specialist gave a detailed presentation on the forms that new hires were required to sign, including the arbitration agreement.  Thus, plaintiff had a substantial period of time in which to decide whether to sign the arbitration agreement, and this *Morrison* factor also weighs in favor of plaintiff's voluntary assent to the agreement.

19

As to the third and fourth factors, plaintiff neither contends that the waiver was unclear or discreetly titled, nor does she dispute that the agreement was supported by legal consideration, in the form of her employment with defendant [Doc. 10-1 pp. 3–4]. Finally, the totality of the circumstances—as evidenced in the record before the Court—weigh in favor of the conclusion that plaintiff knowingly and voluntarily signed the agreement to arbitrate. Thus, the Court finds that plaintiff knowingly and voluntarily entered into the arbitration agreement with defendant, based on the factors set forth in *Morrison*, 317 F.3d at 668.

Plaintiff further asserts that defendant's conduct amounts to "fraud" because its characterization of the forms presented to plaintiff, including the arbitration agreement, as "hiring paperwork" amount to a "false statement" [Doc. 11-2 at 4]. The Court finds, however, that plaintiff has failed to explain how defendant's alleged description of the documents as "hiring paperwork" amounts to fraud under the law and has not submitted evidence that defendant fraudulently misrepresented the nature of the forms presented to plaintiff.

Moreover, a party is presumed to know the contents of a contract she signs. *See Giles v. Allstate Ins. Co.*, 871 S.W.2d 154, 156 (Tenn. Ct. App. 1993) ("[O]ne is under a duty to learn the contents of a written contract before he signs it, and . . . if, without being the victim of fraud, he fails to read the contract or otherwise to learn its contents, he signs the same at his peril[.]"); *see also Davis v. Morningside of Jackson, LLC*, No. 1:05-cv-1284-T-AN, 2006 WL 889325, at *5–6 (W.D. Tenn. Mar. 28, 2006) (finding that, under

Tennessee law, the plaintiff voluntarily entered into the arbitration agreement even though she claims that she did not have time to read the agreement); *Plyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 359 (Tenn. Ct. App. 2001) ("If [the plaintiff] did not read [the agreement], then he cannot be heard to complain about its contents."); *Reno v. SunTrust, Inc.*, No. E2006-01641-COA-R3-CV, 2007 WL 907256, at *5–7 (Tenn. Ct. App. Mar. 26, 2007) (compelling arbitration even though plaintiff argued that she did not realize what she was signing when she entered into the agreement to arbitrate). Plaintiff does not dispute the fact that she signed the arbitration agreement, and the Court has found that she had more than enough time to review the contents of the hiring paperwork and that defendant's benefits specialist explained the paperwork to all new hires on plaintiff's first day of employment. Thus, plaintiff's failure to read the arbitration agreement before signing the binding contract does not allow her to "complain about its contents." *Plyburn*, 63 S.W.3d at 359.

In sum, the Court finds that plaintiff knowingly and voluntarily entered into this agreement with defendant, and the arbitration agreement is, for the reasons stated herein, valid under Tennessee contract law. *See id.* at 359–60 (enforcing arbitration agreement where plaintiff "had to sign a series of documents in succession," where defendant did not mention arbitration agreement to plaintiff, and where it was plaintiff's understanding that he was required to sign all documents); *Philpot v. Tenn. Health Mgmt., Inc.*, 279 S.W.3d 573, 580–82 (Tenn. Ct. App. 2007) (declining to invalidate a contract based on unconscionability where the plaintiff "was presented with a complex admissions packet

21

containing numerous documents and did not realize he was giving up the right to a jury trial"); *Robert J. Denley Co. v. Neal Smith Const. Co.*, No. W2006-00629-COA-R3-CV, 2007 WL 1153121, at *7 (Tenn. Ct. App. Apr. 19, 2007) (holding plaintiff was not fraudulently induced to sign arbitration agreement where plaintiff argued defendant had duty to "disclose" arbitration provision, and finding plaintiff's lack of knowledge "was not caused by fraud . . . but rather [plaintiff's] own negligence in not carefully reading the contract").

### 2.	Scope of the Arbitration Agreement

Having found that the parties entered into a valid agreement to arbitrate under Tennessee contract law, the Court will now determine whether plaintiff's claims fall within the scope of the agreement. *See Javitch*, 315 F.3d at 624 ("Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement.").

"Arbitration agreements are favored in Tennessee by both statute and case law." *Glassman, Edwards, Wyatt, Tuttle & Cox, P.C. v. Wade*, 404 S.W.3d 464, 466 (Tenn. 2013) (citing *Benton v. Vanderbilt Univ.*, 137 S.W.3d 614, 617 (Tenn. 2004)). The TUAA establishes that written agreements to arbitrate are "valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the revocation of any contract." Tenn. Code Ann. § 29–5–302(a). Similar to Congress's enactment of the

22

FAA, "[b]y enacting the TUAA, the [Tennessee] legislature has adopted a policy favoring the enforcement of arbitration agreements." *Glassman*, 404 S.W.3d at 467 (citing *Buraczynski v. Eyring*, 919 S.W.2d 314, 317–18 (Tenn. 1996)).

Here, the written arbitration agreement, which plaintiff signed, states, "Any and all disputes which involve or relate in any way to [plaintiff's] employment (or termination of employment) with [defendant] . . . shall be submitted to and resolved by final and binding arbitration" [Doc. 5-1 p. 4]. Specifically, the agreement provides that covered claims include those related to employment discrimination or harassment on the basis of age or sex [*Id.*].

Although not binding, the Court finds the Northern District of Illinois's opinion in *Hellman v. VW Credits, Inc.*, No. 1:15-cv-1693 (N.D. Ill. May 26, 2015) instructive.[7] In *Hellman*, the district court evaluated whether the plaintiff's claims were covered by the same arbitration agreement that plaintiff signed in our case [*See* Doc. 6-2 (presenting the arbitration agreement signed by the plaintiff in *Hellman*)]. The plaintiff in *Hellman* brought claims under the Fair Labor Standards Act and the Illinois Minimum Wage Law. *Id.* at *1. The court determined that the agreement "plainly covered" the plaintiff's claims, "which undeniably relate[d] to her employment." *Id.* Thus, the court granted the defendant's motion to compel arbitration and stay the case. *Id.* at *2.

---

[7] Plaintiff claims that defendant's submission of this case in support of its motion amounts to an improper reliance on *res judicata* [Doc. 10-1 p. 4]. The Court finds, however, that defendant submitted this case merely as judicial precedence for the Court to consider in making its decision, rather than as *res judicata*. Thus, the Court will evaluate this case, as well as other presented case law, in reaching its conclusion as to defendant's motion to dismiss.

23

As in *Hellman*, the Court finds that plaintiff's age and sex discrimination claims, brought based on events that transpired during the course of her employment [Doc. 1 ¶¶ 26–43], clearly fall within the scope of the arbitration agreement's broad language. The arbitration agreement signed by plaintiff explicitly includes suits relating to the signee's employment and brought on the basis of age or sex discrimination [Doc. 5-1 p. 4]. Thus, according to the agreement's plain, unambiguous meaning, the parties intended to submit claims for retaliation and discrimination brought pursuant to the ADEA, Title VII, and Tenn. Code Ann. § 4-21-401, such as plaintiff's, to binding arbitration. *See Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006) (internal citations omitted) ("A cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties. In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent."). Thus, following the TUAA and its policy favoring the enforcement of arbitration agreements, the Court finds that plaintiff's claims clearly fall within the scope of the valid arbitration agreement between plaintiff and defendant. Tenn. Code Ann. § 29–5–302(a); *Glassman*, 404 S.W.3d at 467; *see Thomas v. Pediatrix Med. Grp. Tenn.*, No. E2009-01836-COA-R3-CV, 2010 WL 3564424, at *5 (Tenn. Ct. App. Sept. 14, 2010) ("As a general rule, any doubt as to whether a dispute falls within the scope of the arbitration provision should be resolved in favor of enforcing arbitration.").

The Court will, therefore, grant defendant's motion to dismiss and direct the parties to proceed to arbitration. Furthermore, because all of plaintiff's causes of action

must be arbitrated, the Court will dismiss the complaint in this case. *See Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000) (stating that courts may dismiss the action rather than stay it when all claims are subject to mandatory arbitration).

## IV.     Conclusion

Thus, the Court will **GRANT** Defendant's Motion To Compel Arbitration and Dismiss Complaint [Doc. 5], **COMPEL** plaintiff to arbitrate her claims against defendant, and **DISMISS** plaintiff's complaint [Doc. 1].   The Clerk of Court will, therefore, be **DIRECTED** to **CLOSE** this case.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE